IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SUNDANCE ENERGY OKLAHOMA, LLC, d/b/a SEO, LLC, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. CIV-13-991-R ) |
| DAN D DRILLING CORPORATION, | ) ) ) |
| Defendant, | ) ) |
| v. | ) ) |
| SUNDANCE ENERGY, INC., | ) ) |
| Counterclaim Defendant. | ) |

# ORDER

Before the Court are Defendant Dan D Drilling Corporation's Motion for Partial Summary Judgment [Doc. No. 64] and Motion for Summary Judgment of Plaintiff Sundance Energy, LLC and Counterclaim Defendant, Sundance Energy, Inc. [Doc. No. 65]. These motions concern Defendant's counterclaim against Plaintiff and Sundance Energy, Inc. ("Sundance") for breach of contract. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A dispute is genuine when a reasonable jury could find in favor of the nonmoving party on the issue." *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712 (10th Cir. 2014). All facts and reasonable inferences therefrom are construed in the light most favorable to the nonmoving party. *Id.*

## Defendant's Motion

### A. Branson Well

Defendant seeks summary judgment on its claim for breach of an express contract for the drilling of the Branson Well. Doc. No. 64, at 6. Plaintiff and Sundance argue that Defendant did not assert such a claim in its Amended Counterclaim, and thus the Court should deny Defendant's motion with respect to that alleged contract. Doc. No. 81, at 8.

Generally, a plaintiff may pursue a particular theory of liability not set forth in the complaint "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits." *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090-91 (10th Cir. 1991) (citations omitted). Under FED. R. CIV. P. 8(a), a party must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." The facts pled must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The purpose of Rule 8(a) "is to give the defendant fair notice of the claims against him." *Evans*, 936 F.2d at 1091.

In the Amended Counterclaim, Defendant alleges that Plaintiff and Sundance "breached the November 29, 2012 contract by directing Dan D drilling to cease all operations for SEO and Sundance," and that they have "refused to pay Dan D Drilling all amounts owed for labor and services performed in accordance with the Contract and for liquidated damages arising from early termination of the Contract." Doc. No. 45, at 6. Defendant further alleges that because of their breach of "the Contract," it "has been damaged in the principal amount of $852,537.50." *Id.*

Defendant attached the alleged Branson Well contract to its motion for summary judgment. Doc. No. 64, Ex. 6. That document includes the signatures of Plaintiff's Manager and Dan Darling, Defendant's President. *Id.* at 6. The signatures are dated June 1 and June 19 of 2012. *Id.* Yet in the Amended Counterclaim, Defendant alleges that "[t]he contract in question was signed by Dan D and sent to SEO on November 29, 2012," and it is this contract that Plaintiff and Sundance allegedly breached that resulted in principal damages of $852,537.50. Doc. No. 45, at 3, 6. Nowhere in the Amended Counterclaim does Defendant mention a June 2012 contract or the Branson Well.

Defendant does allege that Plaintiff "committed to hire Dan D Drilling to drill multiple wells in Oklahoma," and that the parties' rights and obligations would be governed by the same drilling contract form. *Id.* at 4. But these allegations are insufficient to put Plaintiff and Sundance on notice that Defendant seeks damages as a result of a breach of an alleged June 2012 contract covering the Branson Well, and not merely the November 2012 contract covering other wells.[1] Because Defendant has failed to state a claim for breach of the June 2012 Branson Well contract, Defendant's motion for summary judgment is denied to the extent it seeks judgment for breach of that contract. *Cf. Evans*, 936 F.2d at 1091 (citing *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990) ("claim raised not in amended complaint but, rather, in

---

[1] Defendant has attached several different numbers to its label of the Branson Well, including 17-4-23 1HM [Doc. No. 64, at 2], 1HW [*Id.* at 6], and 1-23H [Doc. No. 82, Ex. 6]. In addition, the Human Resources Manager for Darling Oil Corporation stated that "[t]he well initially identified as Branson 1-23H [was] renamed Branson 17-4-23HM." Doc. No. 82, Ex. 13. None of these numbers, however, match the number associated with the Branson Well listed on the November 2012 multiple well contract, 1HM 22-17N-4W. Doc. No. 82, Ex. 6.

plaintiff's response to defendant's motion for summary judgment was not properly before district court")).

B. Rother SWD Well

1. Setoff Right

Defendant also moves for summary judgment on its claim for breach of an implied contract covering the Rother SWD Well. Doc. No. 64, at 8. Plaintiff and Sundance first argue that Defendant is not entitled to summary judgment on its counterclaim because Plaintiff has a right to set off or recoup the damages sought by Defendant against the damages Plaintiff seeks in its claims against Defendant. As a general rule, the common law in Oklahoma provides for no right of automatic setoff by operation of law. *Jones v. England*, 782 P.2d 119, 122 (Okla. 1989). But an equitable right of setoff exists "where grounds of equitable interposition are shown, such as fraud, embarrassment in enforcing the demand at law, or special circumstances, such as insolvency or nonresidence." *Southern Sur. Co. v. Maney*, 121 P.2d 295, 298 (Okla. 1941); *see also Nelson v. Linn Midcontinent Exploration, L.L.C.*, 228 P.3d 533, 535 (Okla. Civ. App. 2009) ("The equitable doctrine of set-off permits the set-off of an obligation under one contract against the obligation of any other contract between the same parties.").

Plaintiff and Sundance argue that Plaintiff is entitled to a setoff because its damages resulting from Defendant's "acts and omissions in connection with its drilling of the Rother Well caused SEO damages that far exceed the damages sought by Dan D for costs purportedly owed under the alleged November 29, 2012 multi-well contract." Doc. No. 81, at 11. This merely states that Plaintiff's damages exceed Defendant's damages.

Plaintiff has not provided the Court with any equitable ground that would justify a right of setoff at this time. Accordingly, the Court will not deny Defendant's motion for partial summary judgment for the reason that Plaintiff is entitled to a setoff.

2. **Notice**

Plaintiff and Sundance next argue that Defendant did not allege in the Amended Counterclaim that there was an implied contract or that Defendant was seeking damages for its drilling of the Rother SWD Well; it alleged only a claim for breach of an express multiple well contract, and the only well it mentioned was the Rother 1 HW 11-16N-4W. Doc. No. 81, at 8-9.

As noted above, a party may pursue a particular theory of liability not specifically alleged in the complaint or answer, "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits." *Evans*, 936 F.2d at 1090-91. The issue in this case is whether, in alleging breach of an express multiple well contract dated November 29, 2012, and mentioning only the Rother Well, Defendant gave Plaintiff and Sundance "fair notice" that it could also pursue its claim under a theory of breach of an implied contract of its drilling of the Rother SWD Well. *See Evans*, 963 F.2d at 1091.

The only difference between an express contract and one implied-in-fact is in the method of proof. *Ray F. Fischer Co. v. Loeffler-Green Supply Co.*, 289 P.2d 139, 141 (Okla. 1955) "[T]he nature of the understanding is the same …. [T]he one must be proved by an actual agreement, while in the case of the other it will be implied that the party did make such an agreement as, under the circumstances disclosed, he ought in

5

fairness to have made." *Id.*; *see also* OKLA. STAT. ANN. tit. 15, § 133 (West) ("An implied contract is one, the existence and terms of which are manifested by conduct.").

In its Amended Counterclaim, Defendant alleges that prior to November 1, 2012, "SEO committed to hire Dan D Drilling to drill multiple wells in Oklahoma for SEO," and that one of the wells included in the November 29, 2012 contract was the Rother 1 HW 11-16N-4W Well. Doc. No. 45, at 4-5. It also alleges that "[i]n accordance with previous practice between and among the parties and custom and practice in the industry, it was contemplated and agreed that the parties' rights and obligations would be governed by a daywork drilling contract utilizing the IADC daywork drilling contract form." *Id.* at 4. Finally, Defendant alleges that Plaintiff and Sundance have not paid it "all amounts owed for labor and services performed in accordance with the [November 29, 2012] Contract." *Id.* at 6. Defendant now moves for partial summary judgment, seeking judgment in the amount of $293,525.00, the amount that Plaintiff has yet to pay for drilling work on the Rother SWD Well that was completed on or about November 29, 2012. Doc. No. 64, at 4, 11. The Court finds that Defendant's allegations are sufficient to put Plaintiff and Sundance on notice of a claim for breach of an *implied* contract, and that the counterclaim defendants are thereby not prejudiced, especially given that the only difference between an express contract and one implied-in-fact contract is the mode of proof.

Defendant also put Plaintiff and Sundance on notice of a claim for damages for its drilling of the Rother SWD Well in particular. In its Amended Counterclaim, Defendant alleges that Plaintiff and Sundance breached the November 29, 2012 multiple well

contract by not paying Defendant for services performed. Doc. No. 45, at 6. It also alleges that, pursuant to that contract, Defendant was required "to provide labor and services in order to drill designated *wells* in search of oil and gas." *Id.* at 5 (emphasis added). The wells listed on the November 29, 2012 alleged contract include the "Rother-1HW 11-16N-4W," the "Rother-1HW 14-16N-4W" and the "Rother-SWD 11-16N-4W." Doc. No. 82, Ex. 6. Although the only well explicitly mentioned in the Amended Counterclaim is the "Rother-1HW 11-16N-4W," Defendant clearly alleged that it seeks damages for breach of the multiple well contract, which included the Rother SWD Well. Consequently, Plaintiff's and Sundance's lack of notice argument has no merit.

### 3. Breach of Contract Analysis

To prevail on its counterclaim for breach of an implied contract covering the Rother SWD Well, Defendant must prove: "1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach." *Digital Design Grp., Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001). In deciding whether an implied contract exists, the Court considers: "(a) the parties' acts, conduct and statements as a whole, (b) whether there was a meeting of the minds on the agreement's essential elements, (c) the parties' intent to enter into a contract upon defined terms, and (d) whether one of the parties has relied in good faith upon the alleged contract." *Dixon v. Bhuiyan*, 10 P.3d 888, 891 (Okla. 2000) (citation omitted). The essential elements that Defendant must prove are "that the service [were] performed under such circumstances as to give the recipient thereof some reason to think they are not gratuitous, not performed for some other person, but with the expectation of compensation from the recipient and

the service must have been beneficial to the recipient." *Mills v. Benton*, 568 P.2d 276, 277 (Okla. 1977) (quoting *Popplewell v. Gregory*, 189 P.2d 941, 942 (Okla. 1947)).

The parties' conduct as a whole demonstrates the existence of a contract. On October 17, 2012, the Oklahoma Corporation Commission approved an application submitted by Plaintiff to drill the Rother SWD Well. Doc. No. 64, Ex. 11. Defendant began drilling the Rother SWD Well on November 12 and completed work on November 29. Doc. No. 64, at 4 (Undisputed Facts 12-13),[2] Exs. 12-13. Defendant drilled at a daily rate of $13,800.00 and sent Plaintiff an invoice for $293,525.00. Doc. No. 64, at 4 (Undisputed Facts 13-14), Ex. 13. Plaintiff received the invoice on or around December 31, 2012, and has yet to pay Defendant. Doc. No. 64, at 4 (Undisputed Facts 15-16).

The above evidence establishes a meeting of the minds on the essential terms of the contract. It is clear that the services Defendant performed were completed "under such circumstances as to give [Defendant] some reason to think they [were] not gratuitous,"[3] the services were performed for Plaintiff with the expectation of compensation from Plaintiff, and the services were beneficial to Plaintiff. *See Mills*, 568 P.2d at 277. The undisputed evidence also shows that the parties intended to enter into a

---

[2] Plaintiff and Sundance do not dispute Paragraphs 11 through 16 of Defendant's Statement of Undisputed Facts, but merely state that such facts are irrelevant. Doc. No. 81, at 6-7. These facts are thus deemed admitted. *See* Local Court Rule 56.1(c) ("All material facts set forth in the statement of the material facts of the movant may be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material facts of the opposing party.").

[3] Plaintiff and Sundance have not provided the Court with any evidence suggesting that the services were gratuitous. *See Morrow v. Morrow*, 612 P.2d 730, 732 (Okla. Civ. App. 1980) ("[T]he party denying liability has the burden of showing the services were gratuitous where the services were performed by someone not a member of the family." (explaining *Mosley v. Mosley*, 321 P.2d 421 (1958))).

contract according to the above terms, and that Defendant, by completing work on the Rother SWD Well, has relied in good faith on the parties' agreement.

There is no genuine dispute concerning the existence of an implied contract between the parties for Defendant to drill the Rother SWD Well for Plaintiff at a daily rate of $13,800 per day. Plaintiff has breached that contract by not paying for such services, and Defendant has suffered damages as a result. Accordingly, Defendant's motion for summary judgment is granted to the extent it requests judgment on its breach of contract counterclaim for drilling work on the Rother SWD Well.

## **Plaintiff's & Sundance's Motion**

A. **Multiple Well Contract**

Plaintiff and Sundance argue that they are entitled to summary judgment on Defendant's counterclaim because they never accepted the terms of the written multiple well contract that Defendant alleges they breached. Doc. No. 65, at 15. They note that "[t]he question of whether <u>some</u> relationship existed between the parties regarding the drilling of a single well in exchange for payment for drilling services is far different than whether SEO accepted all the terms of a <u>specific</u> proposed contract which purported to govern the drilling of seven wells." Doc. No. 91, at 9.

The Court agrees that Defendant has not produced evidence that Plaintiff accepted all of the terms contained in the written November 29, 2012 multiple well contract. Defendant argues that Plaintiff ratified the writing. Doc. No. 82, at 23. Ratification can be found when "a party: 1) has accepted the benefits of the contract, whether void or voidable 2) with full knowledge of the facts 3) at a time when the accepting party was

fully competent and capable of contracting for himself." *Kincaid v. Black Angus Motel, Inc.*, 983 P.2d 1016, 1020 (Okla. 1999) (citations omitted). Defendant is unable to demonstrate that Plaintiff accepted Defendant's drilling services with full knowledge of the terms of the multiple well contract.

First, the multiple well contract "covered more than one well, whereas prior contracts only covered one." Doc. No. 82, at 25. This means that Defendant is unable to rely on the parties' course of dealing because this proposed agreement is materially distinguishable from the prior agreements. Additional considerations come into play when deciding the terms of a contract that covers numerous wells as opposed to only one, the simplest being the fact that a multiple well agreement involves a commitment by both parties of more time and money.

Second, Defendant's evidence related to this particular writing is insufficient for a reasonable jury to find that Plaintiff or Sundance ratified the contract. It first cites to letters from Plaintiff's and Sundance's counsel to Defendant's counsel that "explicitly refer to Section 14.8 of the IADC form contract," demanding that Defendant indemnify Plaintiff and Sundance for any claim arising out of the December 9 accident. Doc. No. 82, at 23-24; Ex. 19. But the attorney who wrote the letters "was even unclear precisely upon which IADC contract he relied when demanding indemnification." Doc. No. 82, at 24. He testified that this was "form indemnification language from any IADC contract." Doc. No. 82, Ex. 19, at 7. Thus, these letters do not support Defendant's contention that Plaintiff and Sundance had full knowledge of the facts related to the November 2012 multiple well contract. Defendant next produces evidence that Plaintiff's and Sundance's

counsel sent the multiple well contract to Sundance's insurer. Doc. No. 82, at 24, Ex. 4, at 10-12. But this fact does not mean that Plaintiff and Sundance were aware of all the terms of the contract and had assented thereto. The insurer could have simply asked for any documentation related to the well where the accident occurred. Finally, Defendant cites to a conversation between Defendant's President and Plaintiff's counsel after the December 9 accident in which the President was concerned about the parties not having a master service agreement, and Plaintiff's counsel responded "the contract will cover that." Doc. No. 82, at 24, Ex. 2, at 18. Again, this remark by Plaintiff's counsel does not demonstrate that Plaintiff and Sundance accepted the benefits of Defendant's services with full knowledge of the terms of the writing.

Nevertheless, Defendant may have evidence to support the remaining alleged damages under a theory of breach of an implied-in-fact contract. The Court may not grant summary judgment for Plaintiff and Sundance on Defendant's counterclaim merely because Defendant does not have sufficient evidence to support the theory of breach of an *express* contract. Because the only difference between the two theories is the mode of proof, insufficient proof to support an express contract does not mean Defendant lacks proof to support breach of an implied contract for other wells drilled. Accordingly, Plaintiff's and Sundance's motion is denied to the extent it seeks judgment on Defendant's breach of contract counterclaim.

### B. Early Termination Provision

Plaintiff and Sundance further argue that the early termination provision of the alleged multiple well contract is not enforceable for several reasons, including the fact

that Defendant has produced no evidence that they agreed to such a provision. Doc. No. 65, at 18. Defendant responds that there is a genuine factual dispute concerning whether the counterclaim defendants agreed to the early termination provision. Doc. No. 82, at 19.

Although Plaintiff did not receive the November 2012 multiple well contract that Defendant alleges governs the parties' obligations until *after* Defendant completed its work on the Rother SWD Well, one of the wells listed in that contract, Doc. No. 65, at 11, Doc. No. 82, at 9 (Undisputed Fact 10), an early termination provision could have been part of an implied contractual relationship between the parties.[4] In support of this argument, Defendant points to two contracts between the parties governing the Kightlinger Well and the Branson Well, both from June 2012. Doc. No. 65, Exs. 1-K, 1-L. Both of these contracts contain early termination provisions. Doc. No. 65, Ex. 1-K, at 2, Ex. 1-L, at 2.

Plaintiff and Sundance argue, however, that the prior contracts with an early termination provision cannot support a claim that such a provision was a term of an agreement covering any other well because the parties signed the contracts "only after negotiations between the parties that frequently resulted in modification to the original proposal." Doc. No. 65, at 10; Doc. No. 82, at 8 (Undisputed Fact 8). Defendant does not

---

[4] *See Dixon*, 10 P.3d at 892 ("Dixons reasons that the right-to-cancel provision—traditionally a part of his negotiated employment contract with TCC—was void since a written contract containing the clause was never presented to him for execution until after a semester's first class had been taught. Dixon's argument is not well taken. TCC's offer of employment for each semester was always predicated in part upon and included a right-to-cancel provision which could be exercised by either party (for any reason) before a semester's classes began.").

dispute this fact,[5] and further states that "[n]egotiations as to specific contract terms resulted in some changes which were interlineated and initialed by the parties." Doc. No. 82, at 14. The early termination provision was one of the terms that the parties negotiated and for which blanks were filled in and initialed by the parties. *See* Doc. No. 65, Ex. 1-K, at 4, Ex. 1-L, at 3. Therefore, Defendant cannot rely on the parties' past practices to support the existence of an early termination provision in their agreement concerning subsequent wells.

Moreover, Defendant has provided no evidence to support its contention that Plaintiff assented to the terms of the written multiple well contract *prior* to Defendant drilling the Rother Well, or ratified its terms while Defendant was drilling. With no evidence to support an agreement on the early termination provision, Plaintiff's and Sundance's motion for summary judgment is granted to the extent it seeks judgment on Defendant's counterclaim for breach of that provision.

### C. Alter Ego Liability

In its counterclaim, Defendant brings a breach of contract counterclaim against both Plaintiff and Sundance. In their motion for summary judgment, Plaintiff and Sundance argue that Sundance may not be held liable for breach of a contract allegedly entered into by Plaintiff because Sundance is a separate legal entity and Defendant cannot meet the burden required to pierce Plaintiff's corporate veil. Doc. No. 65, at 22.

---

[5] Defendant disputes the paragraph containing this fact only to the extent it "implies the Multiple Well contract was not signed by SEO," Doc. No. 82, at 8, and thus the fact concerning contract negotiation and modification is deemed admitted. *See* Local Court Rule 56.1.

Defendant responds that the corporate veil should be pierced in this case because Sundance is the alter ego of Plaintiff. Doc. No. 82, at 31.

Plaintiff is a limited liability company organized under the laws of Delaware, and its sole member is Sundance. Doc. No. 65, at 9; Doc. No. 82, at 6 (Undisputed Facts 1-2). The parties do not dispute that Delaware law applies to the issue of whether the Court should pierce the corporate veil.[6] Accordingly, the Court will apply Delaware law to decide this issue. Under Delaware law, a member of a limited liability company is generally not liable for the debts, obligations, and liabilities of the LLC for the sole reason that it is a member of the LLC. DEL. CODE ANN. tit. 6, § 18-303(a) (West). In determining whether to pierce the corporate veil in this case, the Court will analyze the relationship between Plaintiff and Sundance in the same way Delaware courts analyze the relationship between a corporate parent and subsidiary. *See Birmingham v. Experian Info. Solutions, Inc.*, 633 F.3d 1006, 1018 n.3 (10th Cir. 2011) ("[U]nder Delaware law a limited liability company and its members are treated the same as a subsidiary and a parent for liability purposes." (citations omitted)).

The Court must consider several factors in the alter ego analysis, including "whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors function[ed] properly, and other corporate formalities were observed; [and] whether the dominant shareholder siphoned corporate funds." *Maloney-

---

[6] Technically, Defendant contends that Oklahoma law applies to this issue, but "consents to application of Delaware law for purposes of its response to Sundance's motion for summary judgment only" because "the laws of Delaware and Oklahoma governing alter ego liability appear to ultimately lead to the same legal analysis." Doc. No. 82, at 31 n.6.

*Refaie v. Bridge at Sch., Inc.*, 958 A.2d 871, 881 (Del. Ch. 2008) (quoting *Harco Nat'l Ins. Co. v. Green Farms. Inc.*, No. CIV. A. 1131, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989)). The final factor is "whether, in general, the corporation simply functioned as a facade for the dominant shareholder." *Id.* (quoting *Harco*, 1989 WL at *4). The parent must exercise "exclusive domination and control … to the point that [the subsidiary] no longer ha[s] legal or independent significance of [its] own." *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (quoting *Hart Holding Co. v. Drexel Burnham Lambert Inc.*, No. C.A. 11514, 1992 WL 127567, at 26 (Del. Ch. May 28, 1992)). The subsidiary must be "a sham entity designed to defraud investors and creditors." *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) (citing *Wallace*, 752 A.2d at 1183-85)).

### 1. Whether Plaintiff Was Adequately Capitalized

The first factor is whether Plaintiff was adequately capitalized. Defendant presents testimony from Plaintiff's President in which he states that Plaintiff does not have any assets and that "Sundance has all the working interest" in the wells it drills. Doc. No. 82, Ex. 1, at 12-13. A petroleum landman also attests that he "did not find any oil and gas leases or lease assignments recorded in Logan County in the name of SEO," except for one assignment that Plaintiff held less than five months before transferring the leases subject to that assignment to Sundance. Doc. No. 82, Ex. 10, at 1, 5. This is telling, given that "[m]ost of Sundance's acreage … and development activity are in Logan County, Oklahoma." Doc. No. 82, Ex. 9. Plaintiff's current Secretary also testified that Sundance

is the ultimate owner of Plaintiff's assets and that all of Plaintiff's assets are mortgaged to secure the debt of Sundance. Doc. No. 82, Ex. 4, at 4, 5, 27-28.

Contrary to these assertions, Plaintiff's and Sundance's CFO attests that Plaintiff *does* have assets, which include "oil and gas lease interests and wells in Oklahoma." Doc. No. 65, Ex. 2, at 1-2. The landman also attests that Plaintiff has surface rights in "[a] number of assignments and deeds." Doc. No. 82, Ex. 10, at 5. Thus, there is a genuine dispute regarding whether Plaintiff was undercapitalized.

### 2. Whether Plaintiff Was Solvent

The second factor is whether Plaintiff was solvent. Sundance's CFO attests that Plaintiff is currently, and has always been, solvent. Doc. No. 65, Ex. 2, at 2. Defendant denies this fact because "[b]y definition, an entity with no assets cannot be solvent." Doc. No. 65, at 10; Doc. No. 82, at 7 (Disputed Fact 7). Because the parties disagree as to whether Plaintiff has any assets, the second factor is also in dispute.

### 3. Whether Plaintiff Observed Proper Formalities

The third factor is "whether dividends were paid, corporate records kept, officers and directors function[ed] properly, and other corporate formalities were observed." *Maloney-Refaie*, 958 A.2d at 881. Defendant contends that Plaintiff and Sundance have not observed proper formalities. Plaintiff's Secretary testified that he is not aware of Plaintiff's owner conducting any formal meetings, he has never seen a monthly profit and loss statement or operating statement/balance sheet for Plaintiff, and that Plaintiff does not file its own tax returns. Doc. No. 82, Ex. 4, at 4, 6. Plaintiff's President testified that Plaintiff did not have its own bank accounts in 2012 and that he does not have the

authority to write checks. Doc. No. 82, Ex. 1, at 9. He also testified that Plaintiff's employees' paychecks, including his own, come from Sundance, and that Sundance managed the leasing of Plaintiff's office space. *Id.* at 2, 6. Plaintiff's Secretary testified that there was no agreement between Sundance and Plaintiff outlining the services that Plaintiff, as the parent, would provide to Sundance, the subsidiary. Doc. No. 82, Ex. 4, at 2-3. Finally, Sundance's CFO attests that Plaintiff's expenses are sometimes paid "by way of a check drawn on a Sundance bank account," but in those cases, "[t]he accounts … are thereafter adjusted to reflect the charges against SEO's assets." Doc. No. 65, Ex. 2, at 2.

Plaintiff argues that it has complied with the formalities Delaware requires of limited liability companies. Doc. No. 65, at 25. Defendant agrees that Plaintiff "has complied with the formalities required by the State of Delaware for registering and maintaining its existence as a Delaware limited liability company," except that it disputes that Plaintiff paid a filing fee. *Id.* at 9; Doc. No. 82, at 6 (Undisputed Fact 1). All parties also agree that Plaintiff has complied with the formalities required by Oklahoma for Plaintiff to do business as a foreign LLC in the state, except that Defendant again disputes that Plaintiff paid a filing fee. Doc. No. 65, at 9; Doc. No. 82, at 6 (Undisputed Fact 3). Further, all parties agree that Plaintiff has its own office in Oklahoma City. Doc. No. 65, at 10; Doc. No. 82, at 7 (Undisputed Fact 5). The CFO testified that Plaintiff's "revenues, operating expenses, and capital expenses are booked separately to [Plaintiff's] account at the time the transactions associated with such revenues and expenses are

17

processed." Doc. No. 65, Ex. 2, at 2. Defendant disputes this fact because it argues that Plaintiff has no assets. Doc. No. 65, at 10; Doc. No. 82, at 7 (Disputed Fact 6).

### 4. Whether Sundance Siphoned Funds

The fourth factor is whether Sundance siphoned funds from Plaintiff. Plaintiff's Secretary testified that the money received from drilling production work "is directed to SEO's—to SEO care of Sundance Energy, Inc." Doc. No. 82, Ex. 4, at 7. Plaintiff and Sundance respond that because Sundance is the sole member of Plaintiff, "use by Sundance of SEO's profits does not provide evidence of any abuse of the corporate form" because "members of an LLC own their pro rata share of the LLC's profits and losses." Doc. No. 91, at 14. The Court, however, finds that Plaintiff's profits being held by Plaintiff solely in care of Sundance *is* evidence that Plaintiff is Sundance's alter ego. *See Gadsden v. Home Pres. Co.*, No. CIV. A. 18888, 2004 WL 485468, at *1, *5-6 (Del. Ch. Feb. 20, 2004) (considering the fact that a sole shareholder "transferred any excess cash from the company to his personal accounts" relevant in deciding to pierce the corporate veil).

### 5. Whether Plaintiff Functioned as a Facade for Sundance

For the last factor, Defendant argues that Plaintiff was merely a "facade for its sole member, Sundance." Doc. No. 82, at 35. In support of this claim, Defendant submits evidence that Sundance had to approve all of Plaintiff's drilling contracts, and that Plaintiff's President had no such authority. Doc. No. 82, Ex. 1, at 5-6, 8. Sundance also maintained control over the choice of contractors and subcontractors. *Id.* at 7. Plaintiff's President never saw the contracts or communicated with the contractors. *Id.* at 7, 11. The

President testified that most of the time Sundance did not seek his input on estimating the cost of drilling each well, and he was never consulted by Sundance regarding whether Sundance would pay invoices. *Id.* at 12, 15-16.

### 6. Conclusion

The Court finds that there is a genuine dispute of material fact concerning whether Plaintiff "exist[s] for no other purpose than as a vehicle for fraud." *Wallace*, 752 A.2d at 1184. There is evidence that Sundance is Plaintiff's sole member; Sundance must approve all of Plaintiff's drilling contracts; and that Plaintiff has no assets. Defendant also produced evidence that Plaintiff did not have its own bank accounts, did not have formal meetings, and that income earned from Plaintiff's contracts was provided to Plaintiff, care of Sundance. *Cf. Mason v. Network of Wilmington, Inc.*, No. CIV.A. 19434-NC, 2005 WL 1653954, at *4 (Del. Ch. July 1, 2005) ("Although, in the proper case, the corporate veil may be pierced, Mason has not shown that such relief is appropriate here. She has not demonstrated that Personnel was under-capitalized or that corporate formalities were not met."). Thus, Plaintiff's and Sundance's motion for summary judgment is denied on the issue of alter ego liability.[7]

---

[7] *Cf. Gadsden*, 2004 WL at *1, *5 (piercing the corporate veil when the corporation never owned any assets, after each project was completed the sole stockholder "transferred any excess cash from the company to his personal accounts," and the company "had no resources to honor its warranty promises or otherwise to perform its obligations, independently of" the sole shareholder"); *Harco*, 1989 WL at *6 ("[L]ack of corporate formalities … commingling of assets … [and] the undercapitalization of the corporation…. seemingly present a good case for piercing the corporate veil. At this stage of the proceedings, however, it would be premature to pierce the corporate veil of Green Farms, Inc. because several material facts are still in dispute.").

## **Conclusion**

In accordance with the foregoing, Defendant's motion for partial summary judgment [Doc. No. 64] is GRANTED in part and DENIED in part. Its motion is granted to the extent it requests judgment for unpaid invoices related to the Rother SWD Well and denied in all other respects. Further, Plaintiff's and Sundance's motion for summary judgment [Doc. No. 65] is GRANTED in part and DENIED in part. Their motion is granted to the extent it requests summary judgment on Defendant's counterclaim for breach an early termination provision. Their motion is denied in all other respects.

IT IS SO ORDERED this 20th day of November, 2014.

_____
DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE